MEMORANDUM OF DECISION
This memorandum of decision addresses a petition for termination of the parental rights (TPR) of Christine R. and Russell D., the biological parents of a minor child, Marion R. Marion was born on March 23, 1998. The CT Page 15163 Department of Child and Families (DCF) filed this TPR petition on February 3, 2000. The petition alleges that both respondent parents, by reason of an act of commission or omission, denied this child the care, guidance or control necessary for her physical, educational, moral or emotional well being; that the child was found in a prior proceeding to have been neglected and that the respondent mother has failed to rehabilitate herself that this child has been abandoned by the respondent father; and that there is no ongoing parent-child relationship with respect to the respondent father. For the reasons stated below, the court finds this matter in favor of the petitioner.
On March 22, 1999, following a court hearing, Marion was adjudicated a neglected child and was committed to DCF for a period of twelve months, (Quinn, J.). Thereafter, on February 15, 2000, the commitment was extended for an additional twelve months. In hand service of the TPR petition was effectuated as to the respondent mother on February 8, 2000. As service by certified mail failed to reach the respondent father, the court ordered that service upon him should be made by publication. Such service upon the father was confirmed by the court on May 3, 2000 (Santos, J.) and noted again at the commencement of these proceedings.
The termination of parental rights trial was held on October 10, 11, 12 and 13, 2000. The respondent father was absent from each court session.[2] The respondent mother was in attendance, represented by her court-appointed attorney and attended by her guardian ad litem (GAL), who delivered a statement at the conclusion of the trial.[3] The petitioner and the minor child were represented by their respective counsel throughout the proceedings.
The parties introduced multiple documentary exhibits into evidence during the trial, including psychological reports and the social study. The parties elicited testimony from multiple witnesses including a physician, social service aid, and child educator.[4] Counsel for the minor child, also serving as her GAL, provided vigorous and thorough cross-examination of the witnesses at trial.
The court finds that the Child Protection Session of the Superior Court, Juvenile Matters division, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of the child.
 I. FACTUAL FINDINGS
The court has carefully considered the verified petition, all of the evidence, including the social study and psychological examination, and the testimony presented, according to the standards required by law.[5]
CT Page 15164 Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial:
A. CHRISTINE, THE MOTHER
 1. EVENTS PRIOR TO THE NEGLECT ADJUDICATION
Christine was born on March 27, 1981; she is now 19 years of age. She was the second of six children born to Francis R., of five different fathers. As a child, Christine was the victim of neglect by her mother. She had been raised by her maternal great-grandmother, who is now deceased. Christine completed the eighth grade of formal schooling.
In late February 1998, when Christine was seventeen years old and eight months pregnant with Marion, she moved from her family home in a southern state to a city in Connecticut, in the company of her boyfriend Rexvalore. They resided with Rexvalore's mother Crisma at her home in that city. Christine's first child, Robert, had been born on August 1, 1996: the son of Rexvalore, Robert had remained in the care of his maternal grandmother (MGM) in a southern state. Marion was born at a major hospital on March 23, 1998. At that time, Marion's father, Russell was assumed to be in the military service.
At two weeks of age, Marion was examined at this hospital and found to be in good health. On April 16, 1998, Christine returned Marion to the hospital's pediatric outpatient clinic, as the infant's right leg seemed to remain in a flexed position. Upon examination, Marion was found to have sustained an undisplaced spiral fracture to the right mid-femur. The examining physician had long experience in pediatrics and significant familiarity with causes of physical injury to children, including child abuse. In the absence of other known cause for the occurrence of this type of injury in a non-ambulatory child, the physician considered this fracture of unexplained etiology to constitute a non-accidental injury and accordingly reported it to DCF.[6] Marion was admitted to the hospital where she remained for treatment of her injuries.[7]
DCF responded, obtained a 96-hour hold and thereafter, on April 21, 1998, secured an Order of Temporary Custody (OTC) for Marion through the Superior Court for Juvenile Matters in Plainville, allowing Marion to be placed in foster care. On that date, DCF also filed a neglect petition[8]
and the court issued specific steps for both parents to follow in order to facilitate Marion's child's return to their custody (Ward, J.). (Petitioner's Exhibit 3.)[9]
Christine was charged with Risk of Injury to a Minor, General Statutes § 53-21(1), for the injuries Marion sustained while in her care and CT Page 15165 under her supervision. On April 30, 1999, following a plea of guilty to this felony charge, she was sentenced to serve five years, execution suspended, with five years of probation.[10] (Petitioner's Exhibit 2.)
While these specific steps were pending, Christine had multiple additional involvements with the criminal justice system. (Petitioner's Exhibit 2.) She was charged with Larceny in the fifth degree, General Statutes § 53a-125a for an incident that occurred on June 3, 1998: this charge was nolled at the entry of her guilty pleas on April 30, 1999. (Id.) She was charged with Sexual Assault in the second degree, General Statutes § 53-71(a)(1), superseded by a substitute information charging Sexual Assault in the fourth degree, General Statutes § 53a-73a, for events that occurred on November 11, 1998: the reduced charge was the subject of a sentence of one year concurrent with her felony risk of injury sentence, suspended, with three concurrent years of probation at the court proceedings on April 30, 1999. Subsequently she was charged with Assault in the third degree, General Statutes § 53a-61 and Breach of Peace, General Statutes § 53a-181
for an incident that occurred on November 21, 1998: on April 30, 1999, the Breach of Peace charge was nolled and Christine was sentenced to one year concurrent with her felony sentence, suspended, with three concurrent years of probation. (Id.)
From May 1998 through September 1999, reunification services were made available to Christine through DCF.[11] In addition to her DCF training, Christine's first assigned social worker had a graduate degree in Human Development and Psychology, and was well experienced in the field of "risk and prevention" for infants through five years of age. As initial issues to be resolved as a part of the reunification process, Janice C. credibly identified Christine's immaturity in judgment, anger and emotional volatility, difficulties with parenting, and instability in housing. Specifically, she noted Christine's inability to provide a reliable explanation for the injury sustained by her daughter, her unwillingness to accept responsibility for the injury, Christine's threatening and harassing behavior in conversations, and her difficulty in calming herself down when frustrated and angry. Despite DCF's significant efforts, Christine remained afflicted by these issues even at the time of trial. (Testimony of Janice' C.)
DCF offered to address Christine's obvious need for mental health counseling through referral to Community Mental Health Affiliates. Christine commenced counseling at that agency in May of 1998, attended several visits, then stopped the counseling in June of 1998.
While the April 21, 1998 steps were pending, Christine never secured or maintained adequate housing. During Janice C.'s seventeen months of work CT Page 15166 with this young mother, Christine made her home in eighteen different places.[12] From time to time Christine secured an apartment for a few weeks, occupied local motels, or lived with an individual who had an open DCF case pending. Janice C. taught Christine how to identify a safe housing environment, and clearly explained that it was Christine's responsibility to obtain a stable place for her to live with Marion, if the child was to be returned to her. Janice C. explained the potential availability of subsidized apartments, and Christine put her name on a waiting list for what is popularly known as "Section 8" public housing.
Some of Christine's acceptable housing was provided through DCF resources. During the summer of 1998, Janice C. offered Christine the opportunity to reside in a foster home or shelter, with the goal of developing readiness to participate in DCF's Independent Living Program and thereby to acquire her own DCF subsidized apartment. On August 31, 1998, Christine accepted DCF's supervision and, at her request, she was placed with an experienced DCF foster parent. (Testimony of Janice C., Liz J.)
Within a fortnight after Christine moved to this home, due to Christine's behavioral difficulties the foster mother asked that she be removed. Christine had fabricated an incident involving sexual behaviors among other residents of the foster home, and became enraged when the foster mother reported this incident to DCF. Christine recanted her complaints, and threatened to cause physical harm to Janice C. in an episode that caused the foster mother to become concerned for the safety of her other foster children and herself as well. DCF had enrolled Christine in Bloomfield High School, but she did not continue with classes there. (Testimony of Janice C., Liz J.)
Thereafter, DCF secured housing for Christine at the YMCA, and subsequently at a second foster home for adolescent girls. Here, again, Christine became involved in an altercation with another resident. During this incident, Christine threw a telephone in anger and kicked a dog. Again, the foster mother asked for her removal, and Christine was returned to the YMCA. Here, however, Christine was noted to have been involved in a sexual relationship with another resident, and her removal was required. (Testimony of Janice C.)
From October 15 through November 25, 1998, she resided at Kellogg House, an adolescent emergency shelter. Kellogg House staff coordinates treatment and services for its residents. Credible and consistent testimony from Sara L., a supervising staff member at Kellogg House, established that Christine demonstrated difficulty taking responsibility for her actions while a resident there. Like the social worker, Sara L. noted that Christine had great difficulty in calming herself after CT Page 15167 becoming enraged. Christine engaged in verbal and physical altercations with other residents, bit a staff member, and engaged in sexual activity with a fourteen year old male resident, all in violation of the facility's regulations.[13] Christine left Kellogg House of her own accord, stating to the staff that she was refusing all DCF services. (Testimony of Sara L., Petitioner's Exhibit 1.)
Thereafter, at Christine's request, her custodial status with DCF was dissolved. She began residing with a friend in Rockville, and DCF provided services by referring her to a parenting education program at another hospital. Visitation had been facilitated by DCF through the services of KidSafe: this agency provided transportation for the mother and parenting-training during supervised visitation. Christine participated in this program for several weeks, until she was arrested on December 18, 1998 due to charges that were based upon the sexual contact incident at Kellogg House. (Testimony of Janis C.)
2. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF MARCH 22, 1999
Specific steps were re-established by the court for Christine in conjunction with her plea of guilty to the pending neglect petition. (Quinn, J.) (Petitioner's Exhibit 4.) These steps again set forth clearly stated, concrete actions for the respondent mother to take in an effort to regain the custody of Marion, accompanied by handwritten notes and references to particular providers, all in an effort to achieve reunification between mother and child.[14] DCF's goal in providing services to Christine was to enhance the likelihood that she would be reunified with Marion on a permanent basis. Janis C. provided Christine with precise oral directives, reinforcing the nature and extent of counseling Christine was to receive, for the purpose of "dealing with issues regarding violence and anger, making responsible choices for herself and her child, taking responsibility for protecting her child, exploring her family history and the effects it may have on her." (Petitioner's Exhibit 4.) Visitation with Marion was to take place "as often as DCF permits" and Christine was offered the opportunity to "demonstrate appropriate parent/child interaction during the visits." (Id.) Recommended providers were identified as Catholic Family Services, AIC, Community Mental Health Affiliates (CMHA) and the YWCA for parenting classes. (Id.)
Christine was discharged from the Department of Corrections (DOC) and transferred to the AIC in Waterbury in early Spring of, 1999, in anticipation of her guilty pleas. Court Exhibit I; Respondent's Exhibit G). She remained a residential client at the AIC in Waterbury through July 1999. During this period, from December 1998 through July 1999, DCF had provided visitation with Marion one time per month, pursuant to that CT Page 15168 department's protocol for individuals who were incarcerated or residential AIC clients. At the AIC, Christine participated in anger management training through the Families in Crisis Program. During her stay at the AIC, DCF referred her to another major hospital for a psychiatric evaluation, upon her social worker's thoughtful determination that such assessment might aid Christine in her quest for reunification with her daughter. (Testimony of Janis C.)
Following her evaluation on April 6, 1999, Christine was diagnosed as suffering from Major Depression and Post-Traumatic Stress Disorder. Ongoing psychotherapy and the antidepressant medication Celexa were prescribed to address Christine's significant mental health needs. Christine failed to avail herself of this hospital's services, despite the oral and written recommendations Janis C. provided to her about the need to obtain these services. (Testimony of Janis C.)
In November of 1999, Christine was referred by DCF to Waterbury Youth Services where she was expected to receive parenting and individual counseling. Christine's new social worker had arranged for her to participate in an evening class on Tuesdays, when Christine's work schedule would permit her to attend. Christine registered with that agency, and attended eight sessions with individual counseling. By the end of February 2000, however, Christine had discontinued the classes, without explaining the reason for this action. (Testimony of Nina S.C.)
Upon her release from the AIC during the summer of 1999, Christine came under the supervision of the Office of Adult Probation (OAP). Yolanda M., Christine's probation officer, has sixteen years of experience and had achieved the status of Supervising Adult Probation Officer. Due to her history of convictions, Christine was classified as a "Level 1 "probation client, meaning that she was expected to require a high degree of supervision by OAP in order to satisfy the conditions of probation. Her probation conditions included attendance at parenting classes and compliance with DCF's expectations, including individual counseling. (Testimony of Yolanda M.)
Christine demonstrated her ability, on a number of occasions, to secure lawful employment. She performed unskilled work in the food service industry, in factory and warehouse settings. In October of 1999, Christine worked in the packaging department of a firm in Beacon Falls. In December, she began working at Shaw's Supermarket. However, Christine demonstrated a pattern of leaving jobs soon after she started them. This condition added to the level of unpredictability manifest in Christine's lifestyle, and minimized her ability to maintain an adequate lawful source of income. (Testimony of Janice C., Nina S.C.) CT Page 15169
Christine was less able to secure appropriate housing for herself, and her housing situation remained unstable. She persisted in residing with housemates who were involved in unlawful activities such as possession of narcotics. Following her discharge from the AIC in the summer of 1999, Christine then resided for a brief period with a gentleman friend: when her social worker advised her of this gentleman's extensive criminal history, she moved, but to another apartment in the same building. She resided there for about a week. For a time, Christine resided in a rooming house in Waterbury with two roommates, but left after she was assaulted by these individuals. During this period, Christine did not keep DCF regularly apprised of her whereabouts, but changed her residential address without appropriate notice, and often was unavailable by telephone. (Testimony of Janis C., Nina S.C.) DCF again provided her with specific instructions to follow in applying for Section 8 Housing. (Testimony of Nina S.C.)
Christine reported to DCF workers that she often encountered individuals in her neighborhood who want to do her harm. She continued to maintain a risky lifestyle, making poor choices about friendships. On New Year's Eve of 1999, Christine proudly reported that a man had driven up to her as she stood on the street near her house, invited her to attend a party, and that she had stayed with him all night. She expressed pleasure that the men at this party had called her "wife" and that these strangers were attracted to her. A week or so later, when Christine's conversation with another person was interrupted by a friend, Christine reported that she'd threatened to "kick the friend's butt." Nonetheless, Christine did not identify her lifestyle as risky or dangerous. She instead displayed an angry, tough girl attitude.
Christine visited Marion under DCF supervision during this period. However, her attention to the child was noted to be somewhat limited during the allotted sessions. For instance, when Christine and Marion have been near a busy street with substantial motor vehicle traffic, as when entering or alighting from a parked car, Christine has failed to watch her child or to hold her hand for safety, unless given consistent prompting and reminders by another present adult. When visiting with Marion near a brook in a park setting, Marion failed to keep her eye on the child unless she was specifically directed to do so, preferring to engage the social worker in conversation about non-child related affairs. When Marion was brought to visit Christine in her room, Marion jumped upon her mother's bed, and began playing near an open upper-floor window which had neither screen nor child-barrier: Christine did not notice how attractive and dangerous this open window was for Christine, and did not protect her child from this hazard until the social worker brought it to her attention. (Testimony of Nina S.C.; Anthony S.) CT Page 15170
In November 1999, in a continuing effort toward reuniting Christine with her daughter, DCF referred her to Casey Family Services. Casey declined to accept the case, however, as that agency was aware that DCF had begun preparations for the filing of the termination petition. (Testimony of Nina S.C.)
Christine has undergone two court-ordered psychological evaluations. Robert Meier, Ph.D. examined Christine on August 15, 1998 and September 22, 1999. (Petitioner's Exhibit A, B.) As noted below, after Meier's evaluation, Christine was arrested on September 22, 1999, in violation of the steps of March 22, 1999.[15]
 3. EVENTS FOLLOWING THE FILING OF THE TERMINATION PETITION ON FEBRUARY3, 2000
Although Christine regularly reports to her probation officer, her chaotic lifestyle continues, and Yolanda M. has noted no improvement in Christine's choices insofar as living arrangements or companions are concerned. Yolanda M. has repeatedly advised Christine that she must cooperate with individual counseling services in order to comply with the requirements of her probation and the court-ordered steps. While Christine had not yet obtained this counseling as of the time of trial, disingenuously claiming lack of funds and DCF's failure to obtain appropriate services for her, Christine has promised, on several recent occasions, to comply with these service requirements. As of September 15, 2000, these promises had not been kept. (Testimony of Yolanda M.)
Christine has not completed a program of individual counseling. Christine's social worker urged her to reinstitute counseling with Waterbury Youth Services where she had attended some sessions, but Christine did not follow up with this recommendation. By the summer of 2000, that agency was no longer taking individual clients, so DCF arranged for Christine to apply for counseling at Catholic Family Services. However, Christine did not make the requisite personal contact with that agency, which would accept a referral only upon an individual's contact, not through a social worker. (Testimony of Nina S.C.)
Christine's housing situation has remained unstable. After a period of living with a female friend who had been incarcerated for drug charges and who still maintained cocaine in her apartment, Christine obtained permission to reside at the AIC for a short time. When she left the AIC, she obtained an apartment in Waterbury where she remained for a brief period of time, then obtained another apartment in that city. On September 15, 2000, DCF learned from Yolanda M. that Christine was living at yet another address in Waterbury, different from the address she had provided to her social worker. (Testimony of Yolanda M., Nina S.C.) On September CT Page 15171 22, Christine informed DCF that she would be moving to yet another apartment in Waterbury. However, on October 4, the probation officer informed DCF that Christine had entered the St. Paul DeBenedict Shelter.
Christine has continued her pattern of finding, and failing to maintain employment. After a brief stint at a supermarket, in March of 2000 Christine began working at a recycling company in Waterbury. After leaving that job, she worked for a time at Burger King, and then for a company known as Custom Model. (Testimony of Nina S.C.) Christine is maintained on the employee rolls at Admiral Temporary Services, but there was insufficient evidence from which the court could conclude that Christine has actually worked for that agency.
Christine has continued to visit with Marion under DCF supervision. Transportation has been provided by Anthony S., a DCF social service aide, or through Christine's boyfriend. Significantly, her social worker has noted that during visitation, Christine still becomes distracted from child-related activities, and discusses issues not related to Marion, such as her social activities. For instance, when Marion was brought to visit Christine during the summer of 2000, Christine persisted in discussing a male friend and her interest in promoting a relationship with him, and failed to provide Marion with appropriate attention even with the social worker's attempts at re-directing the conversation back toward the toddler. (Testimony of Nina S.C.)
B. RUSSELL D., THE FATHER
Russell has not been significantly involved in Marion's life. He has shown little interest in the court proceedings affecting this child, either at the neglect or termination stages. Although paternity testing has established that he is Marion's father, he has disavowed interest in this child. (Petitioner's Exhibit 5.) Apart from one brief visit, he has not spent time with his daughter, and has not responded to DCF's inquiries about his position in this matter. (Testimony of Janis C., Petitioner's Exhibit 5.)
C. MARION R., THE CHILD
From her initial placement with DCF, Marion was noted to have delays in cognitive and language development. (Testimony of Janis C.; Anita C.) These delays were manifest at three months through the infant's inability to track, focus or to show visual attention; and in her failure to vocalize when spoken to. As a result, in August of 1998, Marion began to receive care and treatment from the Birth-to-Three Program. Her educational and developmental therapist, Anita C., holds a masters degree in Special Education with a focus on early childhood education, and has CT Page 15172 22 years of experience in working with children, such as Marion, who have special learning needs. The treatment involves teaching therapeutic skills to Marion's caretaker, and providing instruction and a schedule for the caretaker to perform the play-therapy with the child in between the therapist's once-a-week visits. The caretaker's compliance with Anita C.'s treatment plan enhances a beneficial effect for the child. Marion continues to require home-based treatment for her sensory deficits. The home care method of treatment requires the use of consistent behavior management techniques, the maintenance of a structured and organized environment, and the attention of adults who will set limits and respond to Marion in a predictable manner. Maintaining predictability in her environment is especially important to Marion: when this child is in an unpredictable or disorganized environment, subject to change and variation in her caretakers or her living situation, her development becomes compromised. In such circumstances. Marion will attempt to concentrate on the changes occurring around her, to the detriment of her ability to concentrate on learning life skills and development of appropriate behaviors. Indeed. whenever Marion has been placed in an environment which deprived her of predictability or consistency, as when she resided in a foster home which had other children present and which was marked by some tumult, Marion loses the ability to stay focused. In such an environment, this child's inattention increased, and her ability to learn decreased concomitantly. (Testimony of Anita C.)
Marion's response to therapy has been remarkable in the past few months: In Anita C.'s credible expert opinion, this progress is directly attributable to the setting provided by the new foster home where Marion went to live in May of 2000. (Testimony of Anita C.) The desired conditions of predictability, consistency and commitment to follow through with Anita C.'s regimen of play therapy and behavior management are present in this foster home, all to Marion's benefit.
Marion continues to require weekly play therapy sessions from Anita C. While she continues to make steady progress, Marion demonstrates persistent difficulty in processing sensory information, and there remain extant delays in the development of age-appropriate motor skills.
 II. ADJUDICATION
As to the adjudicatory phase of this hearing of the petition for termination of parental rights,[16] the court has considered the evidence and testimony related to circumstances and events following the adjudication of neglect on March 22, 1999 and until February 3, 2000, when the TPR was filed. The court has determined that a statutory ground for termination exists. CT Page 15173
A. LOCATION AND REUNIFICATION
With respect to the statutory element of location and reunification, required for termination pursuant to General Statutes §17a-112(c)(1),[17] the court finds as follows:
1. CHRISTINE R., THE MOTHER
From the clear and convincing evidence presented in this case, the court finds that by establishing the multiple services offered to Christine by way of counseling and family therapy, DCF made reasonable efforts at achieving reunification for this mother and her daughter. Such efforts have been mortally hampered by Christine's persistent unwillingness to benefit from services and her lack of participation and cooperation with DCF or the counseling and therapy provided. Christine's compliance with the proffered mental health services, which were appropriate for the respondent mother's conditions, would have enhanced her opportunities for reunification with her child. In re Antony B.,54 Conn. App. 463, 475, 735 A.2d 893 (1999). Based on all the circumstances here presented, the court finds that the respondent mother was unable or unwilling to benefit from additional reunification efforts.
Christine has argued that DCF's efforts in this regard cannot be considered reasonable. because the department never placed Marion with a family member. She claims that such placement would have enhanced the level of support to which she and her daughter would have access, and thereby would have provided better opportunities for reunification. This argument fails on two grounds. First, there was insufficient evidence from which the court could reasonably conclude that any member of Christine's family was an appropriate caretaker for Marion, had appropriate housing facilities available for the child, was adequately experienced or educated in the care of a child with her particular needs, or was sufficiently interested in her well-being to accept this role. Second, there was insufficient evidence from which the court could reasonably conclude that Christine was close enough to any family member who would be likely to promote this reunion, by caring for Marion, meeting her special needs, and encouraging visitation with her mother. No family member testified at trial concerning the support that may have been available to Marion outside the state of Connecticut. The Social Study and other exhibits fail to persuade the court that placement with Christine's family would have been, at any time, in the best interests of Marion. To find that such placement was necessary as a "reasonable effort" toward reunification in this case, the court would be required to speculate or to rely upon mere argument that was made in good faith, but unsubstantiated by the facts.[18] This, the court declines to do. CT Page 15174
2. RUSSELL D., THE FATHER
The court finds that reasonable efforts have been made to locate Russell, who was not available to the court. Those efforts included DCF's contact with the Department of Correction and the Bail Commissioner, and determination that he has not been incarcerated, recently arrested, nor has he been on probation during these proceedings. The Department of Social Services indicated that Russell is not receiving assistance benefits through that agency. There is no listing of any telephone service for this father published in the telephone directory. Christine indicated that she believes that Russell resided with his mother, but she was unable to provide any address or telephone number at which either could be reached.
As to efforts for Marion's reunification with Russell, the court finds that these efforts would have been fruitless, given his lack of interest in the child or these court proceedings. Further, from the evidence produced at trial, the court found no basis from which it could reasonably conclude that Russell was able to or willing to benefit from reunification efforts.
B. STATUTORY GROUNDS FOR TERMINATION
With respect to the statutory grounds for termination of parental rights, the court finds the following to have been established by clear and convincing evidence:
1. CHRISTINE, THE MOTHER
 a. PARENTAL FAILURE TO REHABILITATE — § 17a-112(c)(3)(B)(1)
The petitioner claims that the statutory ground of parental failure to rehabilitate exists in this case, supporting the application for termination of Christine's parental rights pursuant to General Statutes § 17a-112(c)(3)(B)(1).[19] While Christine has partially attended to some of the court-ordered expectations, the overwhelming evidence establishes that as of February 3, 2000, Christine had neither accomplished such personal rehabilitation as is contemplated by §17a-112(c)(3)(B), nor had she achieved such degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her child, this mother could assume a responsible position in Marion's life. Accordingly, the court finds this issue in favor of the petitioner.
"`Personal rehabilitation as used in the statute refers to the CT Page 15175 restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life.' (Citations omitted; internal quotation marks omitted.) In re Eden F., [250 Conn. 674, 706, 741 A.2d 873
(1999).]. . . . assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue.' (Internal quotation marks omitted). In re Shyliesh H., [56 Conn. App. 167, 180, 743 A.2d 165
(1999)." In re Sarah Ann K, 57 Conn. App. 441, 448, ___ A.2d ___ (2000). Thus, "[a]t the adjudicatory phase of the termination hearing, the ultimate issue faced by the trial court [is] whether the respondent was better able to resume the responsibilities of parenting at the time of filing the termination petition than [she] had been at the time of the child's commitment." (Citation omitted; footnote omitted.) In re HectorL., 53 Conn. App. 359, 367, 730 A.2d 106 (1999).
The evidence presented in this case clearly and convincingly establishes that in the time between Marion's adjudication as a neglected child and the filing of the TPR petition at issue, Christine neither developed not demonstrated the ability to control her temper, her comfort with violence, her predilection for a chaotic lifestyle, or her urge to scoff at authority, except when she is in a highly structured and supervised setting such as that provided by DOC or a residential AIC facility. Christine's relative success in these environments does not, in any way, evidence her rehabilitation or her ability to serve as an effective and appropriate parent for Marion. Christine simply has not met the goals of attaining good judgment, ability to pay due attention to the needs of others, to set valid priorities and to act with maturity, which are all hallmarks of adequate parenting.
The court finds that although Christine has received some parenting education and counseling, there is insufficient evidence from which the court could conclude that she has actually benefitted from participation in a way that would significantly enable her to serve as a suitable parent for Marion. To the contrary, Christine's intractably unstable housing and employment situation, taken together with her failure to fulfill her obligation to obtain individual counseling, is consistent with the other clear and convincing evidence which demonstrates that Christine is not now, nor within a reasonably foreseeable time will she CT Page 15176 be, able to effectively parent her daughter. While Christine has created a lifestyle in which she maintains no anchor, this court cannot allow her child to be similarly set adrift in her mother's boat.
During the adjudicatory period relevant to this case, Christine neither improved her ability to manage her own life, nor did she gain the ability to care for her child in a responsible manner, which would address Marion's special needs. In re Sarah Ann K., supra, 57 Conn. App. 448. Christine continued to change her place of residence on a regular and frequent basis, never maintaining a housing situation that would reasonably meet the needs of herself or her child. She obtained apartments in neighborhoods in which physical safety was of concern even for the mature social services aid who supervised Christine's visitations with Marion. (Testimony of Anthony S.) She continually selected housemates who exhibited criminal or violent behavior, and was the victim of an assault perpetrated by her roommates on one occasion. As noted in Part I. A. 2., above, during the adjudicatory period, Christine placed herself in situations which presented the opportunity for additional serious physical and emotional harm on at least three additional occasions: September 22, 1999, when she was arrested for prostitution-related activities; December 31, 1999, when she was picked up from a street corner by a man unknown to her, and stayed with him and his friends, all strangers, through the night; and early January 2000, when she threatened an individual who had the misfortune to interrupt Christine while she was conversing with another person.
Furthermore, during this time, Christine had services offered to her which were directed at developing her life skills in general, and which were specifically intended to improve her limited facility at interpersonal communications and her ability to use good judgment as far as her child is concerned. Christine persisted, however, in expressly rejecting offers of help from DCF and other service providers. As found in Part I. A. 2., above, Christine refused to follow tip with the mental health care recommended for her during the summer of 1999, following her discharge from the Department of Corrections on April 30, 1999. She was enabled to participate with the Waterbury Hospital psychiatrists and counselors while she was a resident at the Waterbury AIC, but she rejected the offers of medication which could well have addressed her mental needs in conjunction with the also-rejected therapy offered through Waterbury Hospital. While Christine participated in counseling sessions with the Waterbury Youth Services during this period, there was insufficient evidence from which the court could conclude that she made any meaningful progress toward the achievement of maintaining control over her temper, her impulsivity, or the poor quality of her choices with regard to her lifestyle.[20] As the result of her lack of rehabilitation, Christine was no better able to serve as an effective CT Page 15177 parent for her child in February of 2000 than she was in March of 1999. Inre Hector L., 53 Conn. App. 367.
The court is greatly concerned by the manner in which Christine rejected the counseling and medication services offered by the hospital where her underlying depression and post-traumatic stress disorder were diagnosed, as this mirrors Christine's past behavior of failing to follow through with every reasonable opportunity provided for treatment of her mental health. Christine's failure to take proper advantage of the hospital's services is attributable to her unwillingness, during the adjudicatory period, to recognize and accept the seriousness of her mental health disorders. This same stubborn unwillingness or inability to accept her plight and attend to the process of treatment and rehabilitation had plagued Christine from the beginning of her involvement with DCF.[21] The consistent pattern of non-compliance with mental health treatment during the adjudicatory period supports the court's conclusion that Christine was unable to take care of her own needs as of February 3, 2000, and that she certainly is not now, nor is likely to be in the future, able to care for a child, such as Marion, who has special needs of her own.
Although Christine was offered weekly visitation with Marion, following her discharge from the Waterbury AIC in July 1999, the visitation during this period disclosed persistent inadequacies in Christine's ability to responsibly parent her child.[22] Christine failed to appropriately protect her toddler from the dangers presented by automobile traffic, and she failed to safeguard her child from the dangers presented by an open window and a miming brook. Christine's social service aid and her social worker expressed concern at her distractability and self-interestedness during these visitation sessions, leading this court to conclude that the visitation was inappropriately "one-sided in favor of [the respondent]" as she would want to spend a significant amount of time in each visit conversing with the attending department worker, instead of paying attention to Marion. (Internal quotation marks omitted.) In re Amy H.,56 Conn. App. 55, 60, 742 A.2d 372 (1999).
Christine would have the court believe that had she been permitted to move with her child to the state where her own family resides, she would have received the support needed to facilitate rehabilitation Given the lack of contact from Christine's family, the court finds there is insufficient evidence on which to reasonably conclude that such a move would have benefitted Christine herself, let alone Marion. (Testimony of Janice C.) There was insufficient evidence from which the court could conclude that had Christine been enabled to move into a residence with her family, that this housing would have been adequate in any way, either to meet the respondent mother's own needs, or to meet the special needs CT Page 15178 of her child.[23]
It should also be noted that Christine failed to effectively pursue the availability of subsidized public housing in Waterbury, notwithstanding the assistance of DCF. Further, she has failed to comply with the specific step which requires that she avoid further involvement with the criminal justice system. (Testimony of Nina S.C., Yolanda M.)
In opposing the TPR petition, Christine emphasizes the implications of the reports of psychological evaluations performed by Robert Meier, Ph.D.[24] Based upon his assessments of Christine and his review of her interaction with Marion, he concluded in September of 1999 that believed that she should be permitted another six months to demonstrate compliance with the court's specific steps, and to establish a basis for reunification. (Respondent's Exhibit A, p. 9.) Dr. Meier apparently was of the opinion that Christine's failure to meet the court's expectations because DCF failed to provide sufficiently structured interventions, made "less than adequate placements for mother while in DCF custody, and limited involvement by mother [with Marion] during her incarceration." (Id.) He recommended increased contact between Christine and Marion, in anticipation that she would demonstrate thereby her ability to "accept and handle greater responsibility." (Id.)
The court carefully has reviewed the written reports prepared by Dr. Meier, and is unable to entirely credit his opinions, which were largely based upon the inaccurate and self-serving history provided by the respondent mother during clinical interviews. Regarding the propriety of DCF's placements, for example, Dr. Meier relied upon Christine's report that she "refused to stay" at the YMCA "because she kept getting sick". (Respondent's Exhibit A, p. 3.) Christine made no mention, and Dr. Meier apparently had no knowledge, of the fact that Christine was expelled from this facility because she engaged in prohibited sexual relations with another resident. While Christine reported that she was limited in her ability to see Marion because "DCF has not provided transportation," she apparently failed to advise him of her eligibility for the supervised, parenting and visitation program sponsored by KidSafe, in which transportation would indeed be provided to her. (Id., p. 4.) Further, she apparently failed to advise Dr. Meier of the transportation to visitation offered through her social worker aid, Anthony S., as well. Christine also misled Dr. Meier by reporting that DCF was never willing to provide visitation unless Christine amended her work schedule to conform to the available visitation times. Such information is inconsistent with the evidence received at trial, which indicates that DCF made reasonable efforts to change the visitation to weekends at Christine's request. While Christine complained that DCF had provided her with "no assistance" in obtaining an apartment, she apparently declined to inform him of DCF's CT Page 15179 offer for participation in the Independent Living Program, which would have provided such housing for her, or of the efforts to place her on the waiting list for Section 8 housing. (Id.) Significantly, Dr. Meier assumed, in forming his opinions, that Christine had "no major health problems." (Id., p. 5.) His testing showed that "there are no indications of serious emotional problems . . ." in Christine. (Respondent's Exhibit A, p. 6.) Such a conclusion is clearly inconsistent with the results of the hospital evaluation of Christine which led to the diagnosis, some five months earlier, that she was suffering the from Major Depression and Post Traumatic Stress Disorder conditions which are consistent with her pattern of behavior. (Petitioner's Exhibit 5, p. 15.)[25] Indeed, Dr. Meier candidly admits the potential for inaccurate test data where Christine is concerned, noting that "the reliability of [his test] results must be questioned due to mother's defensiveness." (Respondent's Exhibit A, p. 6.)
The court's determination to give little weight to Dr. Meier's reports and opinions is further supported by Christine's own conduct. Immediately following Dr. Meier's evaluation on September 22, 1999, while the specific steps of March 22, 1999 were pending, Christine was arrested and charged with the criminal offense of Prostitution, General Statutes § 53a-82 for an incident that occurred on that date: on January 4, 2000, this charge was disposed of with the assignment of a one hundred dollar fine.[26] (Id.) It is of note that this offense occurred nearly simultaneous to Dr. Meier's development of conclusions which have been offered by the respondent mother in support of her alleged ability make appropriate decisions about her own life, and thus to serve as an acceptable parent for Marion. (Respondent's Exhibit A.) Reality belies the respondent mother's claims that she is able to become rehabilitated within a reasonable period of time, notwithstanding Dr. Meier's global conclusions to the contrary.
Through her attorney and her GAL, Christine has drawn the court's attention to placements that she feels were inappropriate, and which, therefore, were not conducive to her rehabilitation. This court disagrees. Christine claims, for instance, that while at Kellogg House, she was the only female among male clients. This placement does not excuse her participation in sexual activity with a younger resident: this incident, instead, emphasizes Christine's determination to avoid structure and supervision, unless it suits her purposes. Christine claims that her placement in the first foster home was also inappropriate, because she was much older than the other children there. Again, however, this situation does not provide a reasonable basis for Christine's violent outburst in response to learning that the foster mother had contacted DCF concerning Christine's allegation of sexual activity in the home. Even when Christine was placed in a foster home CT Page 15180 where only adolescent girls were residents, she again conducted herself in a violent manner. (Testimony of Janice C.)
The statutory framework created by § 17a-112(c)(3)(B) requires the court not only to analyze the parent's rehabilitation as it relates to the needs of the particular child, but also to consider if such rehabilitation is foreseeable within a reasonable time. In re Hector L., supra, 53 Conn. App. 367 366-467. Because of this requirement that the court predict what may happen within a reasonable time after the filing of the petition for TPR, the court must consider not only Christine's conduct prior to the filing of those petitions, but also her conduct after that time. In this case, this was a period of some eight months, during which time Christine made no discernable progress in her personal rehabilitation process.
In this matter, Christine had services made available to her commencing in May of 1998. However, Christine's cooperation with DCF's services directed toward rehabilitation and reunification with her daughter could best be described as desultory. Given the long period of time DCF worked with her, first by providing her with anger management and family violence counseling, with educational support services, and with efforts at family and individual therapy both before and long after Marion was removed from her care in 1997, the court reasonably and logically infers that Christine will not become rehabilitated soon, if ever, as to Marion. The respondent's inability to develop insight into the history of physical abuse toward Marion, and her apparent unwillingness to discuss this matter with mental health care providers, has prolonged the period of uncertainty and instability in which this child has been placed. The long period of time during which efforts were made for her mother without any resolution for this child continued to contribute to Marion's difficulties, without any resulting benefit to the child. Additionally. Probation Officer Yolanda M. has, on many occasions in recent months, emphasized to Christine the need to obtain counseling: although Christine has frequently "promised" to schedule herself for therapeutic sessions, she has yet to follow through with these promises. (Testimony of Yolanda M.)
Christine claims that she has made progress toward rehabilitation during the adjudicatory period and thereafter. She presented the testimony of Anthony S. who has provided supervision and transportation for Christine's visits with Marion over the years. Anthony S. candidly reinforced the observations made by others, however, that Christine then demonstrated and still has an obvious need for continued instruction and support with regard to providing care for her daughter. Even in recent months, he has found that Christine fails to watch Marion closely "enough, and that in a public place, such as a shopping mall or a CT Page 15181 playground, Christine is prone to be inattentive to the child, who is left to wander away: the respondent requires consistent prodding and reminders to keep her child away from potential safety hazards. Anthony S. explained that Christine would often spend her visits with Marion socializing with other adults and focusing on matters other than her daughter, even though their time together is limited: sadly, his reports on Christine's self-absorbedness during visitation were consistent with those presented by the social workers, and also mirror her limited attention span when it comes to holding employment or keeping an apartment. (Testimony of Anthony S., Nina S.C.) Overall, Christine has demonstrated no improvement in the degree of attention to or interest in her child during the visitation period, supporting the court's conclusion that she is not likely to achieve these goals within a reasonable time.
Despite all that has been offered to her, Christine continually resists the efforts of DCF and the mental health professionals who have sought to assist her in developing insight into the basis for her poor judgment, persistent immaturity, and predilection for a chaotic and unpredictable lifestyle. Such a lifestyle does not produce a stable and secure environment as is conducive to the healthy growth and development of a young child such as Marion. Christine's refusal to follow through with the recommended course of medication and mental health treatment confirms the other evidence which establishes that Christine persists in a willful and immature desire to achieve immediate gratification, to the exclusion of long-term planning, notwithstanding the adverse effect upon her. Despite even Anthony S.'s "fatherly advice" to Christine she has, in his opinion, failed to "get her feet on the ground" or even "learned to take care of herself' during all the months he has supervised her visitation with her daughter. (Testimony of Anthony S.)
Based on all the evidence provided to the court,[27] it is clear that Christine has not achieved the rehabilitation that would make her an appropriate candidate for provision of maternal services to Marion. The evidence clearly and convincingly demonstrates that she has not achieved a level of rehabilitation which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life. In re Eden F., supra, 250 Conn. 706. Accordingly, the court finds this issue in favor of the petitioner.
b. ACT OF OMISSION OR COMMISSION — § 17a-112(c)(3)(C)
The petitioner also claims that the statutory ground of act of omission or commission exists in this case, supporting the application for termination of Christine's parental rights pursuant to General Statutes § 17a-112(c)(3)(C).[28] The clear and convincing evidence in this case reflects that Marion was denied, by reason of an act or acts of CT Page 15182 maternal commission or omission including severe physical abuse, the care, guidance or control necessary for Marion's physical and emotional well-being. The clear and convincing evidence further discloses, in this case, a nonaccidental or inadequately explained serious physical injury caused to Marion, by way of the spiral fracture she sustained to the left femur when she was under the care and custody of her mother. Pursuant to General Statutes § 17a-112(c)(3)(C), such injury constitutes prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights. Accordingly, the court finds this issue in favor of the petitioner.
Marion had lived with her biological parents from the time of her birth until this hospitalization. Christine had exclusive parental control and custody of the child during the days immediately preceding the child's injuries, as Russell had no contact with the infant. On occasion, Christine would allow Crisma to care for her newborn, although Christine knew she was taking Percocet for a broken ankle and also consuming substantial amounts of vodka on a daily basis. Neither Christine, Rexvalore, his mother Crisma nor Crisma's live-in boyfriend offered any adequate or plausible explanation for the infant having sustained this nature of injury.[29] Christine herself offered multiple different versions of the origin of the injury in her conversations with DCF's investigator. (Testimony of Mary Beth H., Darren Pearson; Petitioner's Exhibit 5.)
The cogent and consistent opinion of the physician who examined Marion, based on his education and long experience with such matters, established that in the absence of a plausible explanation for the injury, and in the face of multiple inconsistent explanations, this injury was caused by the application of a significant amount of rotational force to the infant's leg. Such forceful and intentional twisting or torsion was required in order to create the specific type of fracture that was noted. The physician credibly and logically ruled out the possibility that this fracture was accidentally sustained or unintentionally caused to occur: no reliable history was provided to indicate that any person had observed a fall from a bed, crib, or changing table which could conceivably have caused the infant's leg to be twisted in a misguided effort to prevent further injury. After close examination, the physician was able to discern no other signs or symptoms that would have indicated that the baby had been exposed to the degree of trauma that would likely have accompanied such a fall or rescue effort. (Testimony of the physician.) While, no individual has been positively identified who was directly responsible for this event, and while multiple inconsistent explanations have been provided for this serious injury, the clear and convincing evidence presented in this case establishes that Marion's spiral fracture was caused by application of CT Page 15183 inappropriate and unnecessary force to Marion's lower extremity when she was a tiny infant. The evidence in this matter is sufficient to establish that the respondent mother had, at a minimum, failed to protect her child under those circumstances which occurred on April 16, 1998, only a few weeks after Marion's birth. See In re Cheyenne A., 59 Conn. App. 151,158, 159, ___ A.2d ___ (2000).
The ground of act of omission or commission is significantly applicable to Marion's past and future well being. Here, the child was clearly exposed to nonaccidental or inadequately explained serious physical injury which was caused to her by others when she was a newborn, in nature's most fragile state of human being, and when she was most definitely in need of vigilant attention and protection from harm. See § 17a-112(c)(3)(C). Christine has yet to acknowledge her responsibility for, if not participation in, the cause of that original serious physical injury.27* Under all the circumstances here existing, the court concludes that the ground of act of omission or commission has been proved by clear and convincing evidence.
2. RUSSELL D., THE FATHER
 a. ABANDONMENT — § 17a-112(c)(3)(A)
The petitioner claims that the statutory ground of abandonment exists in this case as to the respondent father, pursuant to the application of General Statutes § 17a-112(c)(3)(A).28* The uncontroverted evidence in this case establishes that Russell has neither called to inquire about the well-being or progress of this child, nor has he had any visitation, sent any cards, letters or gifts, nor paid any support for Marion. Russell has no relationship with his daughter, and he has abandoned this child in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of his daughter. Accordingly, the court finds by clear and convincing evidence that Russell has abandoned Marion, within the meaning of § 17a-112(c)(3)(A).
b. ACT OF OMISSION OR COMMISSION — § 17a-112(c)(3)(C)
The petitioner also claims that the statutory ground of act of omission or commission exists in this case, supporting the application for termination of Russell's parental rights pursuant to General Statutes § 17a-112(c)(3)(C). As there is no evidence from which the court could conclude that Russell had contact with Marion or played any role in her life at the time the child sustained her serious injury, the petitioner cannot prevail on this ground. CT Page 15184
c. No ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112(c)(3)(D)
The petitioner further claims that the statutory ground of no ongoing parent-child relationship exists in this case as to Marion and her father, further supporting the application for termination of Russell's parental rights pursuant to § 17a-112(c)(3)(D).29* The clear and convincing evidence in this case establishes that there is absolutely no ongoing parent-child relationship between Russell and his daughter, in terms of the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child, As discussed in Part III. B., below, to allow further time for the establishment or reestablishment of such a parent-child relationship would be detrimental to the best interest of the child. Accordingly, the court finds this issue in favor of the petitioner.
 III. DISPOSITION
As to the dispositional phase of this hearing,[30] the court has considered the evidence and testimony related to circumstances and events up to and including October 13, 2000, the date upon which the evidence in this matter was concluded.
A. SEVEN STATUTORY FINDINGS
With respect to the seven written factual findings required by General Statutes § 17a-112(d) [now § 17a-112(k)], the court has recorded its findings below. The court has considered the evidence and information relevant to each of these findings in the course of determining whether to terminate parental rights under this section.[31]
 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112(d)(1)
As to the timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with her mother, the court finds by clear and convincing evidence that appropriate and timely services were provided by DCF, including housing, housing assistance, counseling, transportation assistance, and visitation coordination. The critical components of individual counseling, parenting counseling, parenting education and housing services for Christine were facilitated through numerous agencies, including: DCF's multi-faceted Independent Living Program, in which Christine refused to participate; DCF Licensed Foster Care, where Christine received placement services as a minor; Kellogg House, where Christine resided in a DCF youth shelter placement for approximately two weeks, from which she was removed, and at which she had received some CT Page 15185 individual counseling but failed to attend the GED classes for which she had been scheduled; YMCA Youth Shelter, where DCF secured housing and support services for Christine on two occasions; Community Mental Health Affiliates, where she attended individual counseling one time per week from June through July 1998; Catholic Family Services, where substance abuse evaluations were made on May 27, and August 31, 1998, without further recommendations for treatment; Catholic Family Services of Waterbury, which agency accepted Christine for provision of psychiatric and psychological services, although she has yet to participate in any evaluation or treatment; Waterbury Youth Services in Waterbury, where Christine commenced attendance at parenting classes; the major hospital where Christine was referred for an assessment and treatment of her mental health needs; Section 8 Housing in Waterbury and New Britain, where Christine has been enabled to submit applications for space which may become available to provide her housing needs; KidSafe, where six weekly visitation sessions with assistance by a parent educator-model took place between November 16 and December 14, 1998 and which sessions were interrupted by Christine's incarceration and subsequent refusal to participate. Christine completed a program in Anger Management at Families in Crisis, Inc. May 13, 1999. (Testimony of Janis C.)
Marion was referred to the State of Connecticut's Birth to Three Services Program at the age of four months, and she has continued to receive these services.
Visitation has been consistently facilitated by DCF through provision of transportation for Marion, who was brought to see her mother during her stay at the AIC and, thereafter, at her various residences. DCF also provided some transportation services through bus passes: however, the use of these passes would have required Christine to negotiate a long and tedious series of transit and transfers. After her release from the AIC, DCF also offered Christine the opportunity for transportation to supervised visitation and parenting-training sponsored by KidSafe. For reasons that were not made clear to the court, Christine refused to renew her participation in this valuable program. (Testimony of Janis C.)
 2. REASONABLE EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW — § 17a-112(d)(2)
As to whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, this court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the parents and child given the situation and circumstances as far as possible, given Russell's unavailability, Christine's persisting problems in rehabilitation and her failure to acknowledge her role in Marion's injury. The court notes that DCF has CT Page 15186 offered and provided services as outlined above, and as more specifically referenced at "trial and through the Social Study. (Petitioner's Exhibit 5.) The court finds that the action of DCF to institute termination proceedings is consistent with the federal law designed to eliminate foster care drift and to secure permanent placement for a child, such as Marion, who is in foster care.
3. COMPLIANCE WITH COURT ORDERS — § 17a-112(d)(3)
As to the extent to which all parties have fulfilled their obligations under the terms of any applicable court order, entered into and agreed upon by any individual or agency and the parent, the court notes that Russell has not been a party to any such orders. The court finds, however, that DCF, with the approval of the courts, established reasonable and realistic expectations as to the respondent mother on April 21, 1998 and March 22, 1999, in order to facilitate reunification of the family. The court further finds by clear and convincing evidence that Christine complied with some of these expectations, but that she failed to adequately comply with certain specific expectations intrinsically related to improving her parenting skills and her relationship with Marion, specifically noting her lack of completion of individual therapy. She has failed to address the issue of personal responsibility, including maintenance of appropriate housing and income, in a meaningful way despite the multiple services offered to her. On balance, Christine has failed to adequately comply with the court orders issued in this matter.[32]
 4. FEELINGS AND EMOTIONAL TIES OF THE CHILD — § 17a-112(d)(4)
As to Marion's feelings and emotional ties with respect to her biological parents and caretakers, the court finds by clear and convincing evidence that the child has developed strong emotional ties with her current foster parents. The court finds, as well, that the foster parents have provided the physical, emotional and educational support needed by this child, and that they wish to adopt Marion. Marion has no emotional ties to her biological father Russell.
As to Christine, the court finds that Marion has some positive feelings about her mother, and that she enjoys her company, particularly as a playmate. These feelings do not, however, rise to the level of an emotional bond between biological mother and daughter which outweighs the benefits of terminating Christine's parental rights insofar as Marion is concerned. See IN re Quanitra M., supra, 60 Conn. App. 106-107.
5. AGE OF THE CHILD — § 17a-112(d)(5)
CT Page 15187
As noted, Marion is two and a half years old. She has special needs relating to her ability to learn, as reported above. The court finds, based on the clear and convincing evidence presented at trial, that this child requires stability of placement and continuity of care in order to maximize her opportunity for healthy development and a well-adjusted childhood. She requires closure of the issues related to whether or not her biological mother will be able to assume a responsible position in Marion's life within in a reasonable period of time: the court has answered this question in the negative, given the "age and needs of the child." In re Hector L., supra, 53 Conn. App. 366-67.
6. EFFORTS MADE BY THE PARENTS TO ADJUST THEIR CIRCUMSTANCES — §17a-112(d)(5)
As to the efforts each parent has made to adjust his or her circumstances, conduct or conditions to make it in the best interest of this child to return to either's home in the foreseeable future, the evidence in this case clearly and convincingly indicates that Russell has failed to maintain due contact with his daughter, her guardian or with her foster families. While Christine has maintained some contact with Marion, the court received no evidence that Christine made significant contributions to her daughter's well-being, other than through her attendance at a number of the scheduled visits. Although Christine has had employment and had completed her GED, there was insufficient evidence from which the court could conclude that Christine regularly sent her written correspondence, holiday greetings, mementos or gifts of any nature. Similarly, there was insufficient evidence from which the court could conclude that Christine had made regular inquiries about her daughter by using the DCF caseworkers as a conduit.
The court further finds that Christine's failure to make appropriate use of the individual and family therapy programs offered her indicates that she has not made meaningful or sustained "efforts to conform her conduct to even minimally acceptable standards for the parent of a child who has suffered physical abuse. While she had made progress in visiting her child, the "respondent mother's visits did not indicate that Christine was committed to establishing and maintaining a stable parent-child relationship. See In re Michael L., supra, 56 Conn. App. 688,694, 745 A.2d 847 (2000). Additional time would not likely bring Christine's performance, as a parent, within acceptable standards sufficient to make it in the best interests of the child for her to be reunited with her biological mother.[33]
 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING A RELATIONSHIP WITH THE CHILD — § 17a-112(d)(6)
CT Page 15188
As to the extent to which either parent has been prevented from maintaining a meaningful relationship with Marion, by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent, the court finds by clear and convincing evidence that while the respondent mother's means were limited, no extrinsic factors existed, other than the structure of the foster care system in general, which prevented regular, continuing contact with either the child or the foster family. Although time away from her mother acted as a partial barrier to maintaining the parent child relationship, it is clear that Marion has been maintained in foster care to keep her safe from further harm. While Christine claims that economic factors, including her work schedule, impeded her visitation, the court found this claim to be unreliable, unsupported, and contradicted by the evidence of DCF's efforts to facilitate transportation enabling visitation to take place.
Christine further claims that DCF limited her visits with Marion while she was confined at the AIC in Waterbury, interfering with her ability to develop and refine her maternal skills. The court finds that this three-month interval did not, under the totality of the circumstances, adversely affect the child-mother relationship. In addition, Christine claims that DCF failed to increase her contacts with Marion notwithstanding Dr. Meier's recommendations for an enhanced schedule of unsupervised visitation, and that the department allowed Marion to be placed outside of Waterbury, which made it difficult for her to visit the child. The court finds that DCF's hesitance to provide unsupervised visitation between Christine and Marion was reasonably based upon Christine's persistent lack of compliance with service requirements, which implied that she was not yet sufficiently responsible to serve as the primary caretaker for her child, even for brief periods. The court finds that there was a valid basis for DCF's decision to offer supervised visitation which ensured Marion's safety, that the department consistently provided transportation to effectuate visits, and that its conduct did not unreasonably interfere with Christine's ability to maintain a relationship with her daughter.
Christine also claims that from the inception of her relationship with DCF, the agency had identified Marion as a child who should be adopted, and the respondent as one whose parental rights should be terminated. DCF's records do reflect, in some places, that its intentions were directed at making Marion available for adoption. However, other records show, as does the evidence, that DCF concurrently provided adequate rehabilitation services for Christine and that the department consistently made reasonable efforts at reunification for this mother and child, as noted in other parts of this opinion. Had Christine made adequate progress toward rehabilitation, or had she demonstrated a CT Page 15189 reasonable degree of commitment toward compliance with the court ordered steps, the TPR petition could have been rescinded by DCF at any time. (Testimony of Nina S.C.) Under the totality of the circumstances affecting this case, the court does not find that DCF's identification of Marion as an adoptable child hampered or interfered in any way with Christine's opportunities for rehabilitation or reunification.
In sum, there was insufficient evidence presented from which the court could reasonably conclude that Christine was prevented from maintaining a meaningful relationship with Marion by any factors contemplated by §17a-112(d)(7).
B. BEST INTERESTS OF THE CHILD — § 17a-112(c)(2)
The court is next called upon to determine whether termination of the parental rights of Christine and Russell would be in the best interests of their child.[34]
Marion's GAL reported that while she initially believed that reunification with Christine was in the best interests of her ward, her opinion has been modified as the result of the respondent mother's behaviors over the past several months, while this matter has been awaiting trial.
Now the GAL is of the opinion that the rights of both parents should be terminated, and she has so recommended to the court. In reaching her opinion, the GAL has acknowledged the relative disadvantages of foster care and weighed them against the potential harm that Marion would suffer if she continued to be exposed to her mother's persistent disorganized, immature and self-absorbed behavior. Marion's current foster parents intend to adopt her if she becomes available for adoption. (Testimony of Nina S.C.) Adoption, with a childhood in the appropriate environment provided by the resourceful and attentive parents who are now caring for Marion, represents the best available option for the daughter of Christine R. and Russell D.[35] As Marion's attorney persuasively argued, under these circumstances, the court should not be required to wait any longer for Christine to attempt to rehabilitate herself, but should focus instead upon the optimum manner of meeting the needs of the child.
In her current foster home, Marion has been fortunate enough to encounter the predictable and well-organized environment which maximizes her ability to thrive and prosper. Her foster parents have demonstrated good instincts for the care of Marion, and are able to meet her special needs, with the help of the Birth-to-Three Program. The foster family is extremely involved with the play-therapy being used to address Marion's CT Page 15190 sensory processing deficits, and effectively cooperates with Anita C.'s written and oral instructions, maximizing the benefit this child can obtain from this program of pre-school intervention. The family is committed to Marion's progress, implements the treatment in an organized way, and parents this child consistently, thus effectively minimizing Marion's exposure to confusion, disorganization and change which could otherwise mar her young world.
Marion is strongly bonded to her new foster family, as is evidenced by the diminution of tantrum behavior which she had previously used to provide self-comfort. With the present foster family, Marion has learned to look to others for comfort. With the development of her healthy attachment to her new foster family, Marion has developed the ability to trust others: this ability has been derived from the combined factors of love, skilled attention, and organization present in the new foster home. The ability to trust others is critical to enhancing her learning process. (Testimony of Anita C.) In the court's opinion, Marion is now residing under conditions that are optimal for her future growth and development. On the other hand, to return Marion to any environment that evinced chaos, disorganization, lack of structure, disruptive housing situations or personalities, would unreasonably risk the loss of all she had gained, and seriously threaten her ability to progress.
As noted above, Christine has persisted in maintaining an unstable housing situation, with nearly constant moves from residence to residence. She takes pride and finds pleasure in her risky interpersonal encounters and her brushes with violence. She has failed to maintain regular employment, changing jobs with frequency. She has failed to avail herself of DCF's services, including the ILP, offered when she was a committed child and thereafter. She has failed to comply with the conditions of probation imposed as the result of her criminal conviction related to the spiral fracture suffered by her child. She has failed to provide any reasonable explanation for the circumstances under which that injury was caused or allowed to occur. She has failed to avail herself of the opportunities offered for addressing her mental health conditions. All of these failures demonstrate that Christine is unable now to effectively take care of herself, and that she is not likely to be able, now or in the future, to provide effective parenting for Marion.
This court adopts the well-reasoned position taken by counsel for the minor child, and concludes that the termination of parental rights would have significant benefits for Marion. Termination will end the questions about whether she will ever have a future with her biological mother, enable her to reside in a stable and secure setting from which to face her impending school years, and protect her from the possibility that Christine would otherwise attempt to interfere with Marion's life in the CT Page 15191 future.
Based upon the foregoing, the court concludes that it is in Marion's best interests to terminate the parental rights of Christine and Russell. This finding has been made with consideration of Marion's sense of time at age two and a half, this young child's need for a secure and permanent environment free from questions about her future, the loving relationship that the child has with her foster mother at this time, and the totality of circumstances existing in this case.
 IV. ORDER OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights and having determined, upon all of the facts and circumstances presented, that it is in the child's best interests to terminate the parental rights of Christine R. and Russell D., accordinglyORDERS:
That the parental rights of Christine R. and Russell D. are hereby terminated as to Marion R.
That the Commissioner of the Department of Child and Families is hereby appointed the statutory parent for Marion, for the purpose of securing an adoptive family or other permanent placement for this child.
That within thirty days of this judgment a written report addressing such permanency plan shall be submitted by the Commissioner, and that such further reports shall be filed by DCF as are required by state and federal law.
BY THE COURT,
N. Rubinow, J.